# EXHIBIT A

**How People Go Down Dangerous Online Pathways**

**Introduction**

My name is Jason Blazakis and I am a professor of the practice at the Middlebury Institute of International Studies, where I also serve as the Executive Director of the Center on Terrorism, Extremism, and Counterterrorism (CTEC).[1] CTEC is among the most preeminent institutions that explore the contours of accelerationist thought, violent extremism, nihilistic violent extremism, and the transnational radical right. Furthermore, my own specific experience as a long-time government employee who has worked on counterterrorism shapes my views on individuals engaged (or have plotted) in acts of violence, such as terrorism. In my work as an Office Director at the Counterterrorism Bureau at the U.S. Department of State I have met with terrorists, including former terrorists. My job was to recommend to the Secretary of State who should be labeled a terrorist pursuant to U.S. law. In a word, I was a 'voyeur.' My team and I in the Office of Counterterrorism Financing and Designations would delve into the world of terrorism by reading open-source (unclassified information) and highly classified intelligence about the individuals (and groups) we would recommend for 'designation' as a terrorist.

It was a dark world but in doing this work, I was exposed to the minds of terrorists – allowing me to gain a glimpse, sometimes fleeting, into what animated them to violence. As such, I am well positioned to offer the court an objective analysis of how an individual may move towards violence. What this paper, however, details herein are not just my views alone, but those of a range of experts.

The first four sections of this paper synthesize CTEC research on online pathways to political violence to explain how individuals can move from low-commitment online engagement to riskier forms of participation—and, in a smaller subset of cases, from rhetoric to violence. Across CTEC publications, the internet is treated not only as a distribution channel for ideas, but also as a social system that offers belonging, status, validation, and, at times, enabling knowledge. Those functions can lower the friction between grievance and action, especially when online communities supply moral permission for escalation and when real-world or personal triggers create a sense of urgency.[2] CTEC's publications make clear that individuals are not radicalized in a vacuum, but rather their worldviews are shaped by a dangerous online ecosystem with very few guardrails. Section V of this paper examines the challenge of algorithmic radicalization – a phenomenon that impacted Michail's own pathway to inciting violence. In section VI, I provide my concluding views following my conversation with Michail.

---

[1] The views expressed in this submission are solely those of the author and do not represent the views of the Middlebury Institute of International Studies, the Center on Terrorism, Extremism, and Counterterrorism, or any other institutions I am affiliated with.

[2] "CTEC Publications," Middlebury Institute of International Studies at Monterey (CTEC), accessed January 14, 2026, https://www.middlebury.edu/institute/academics/centers-initiatives/ctec/ctec-publications

## I. From Curiosity to Community: Social On-Ramps and Early Engagement

CTEC research underscores that many dangerous online pathways begin with ordinary motives—curiosity, identity exploration, entertainment, or community—rather than an immediate commitment to extremist ideology. Early engagement is often low stakes: a user watches clips, browses threads, laughs at edgy memes, or follows a charismatic personality. The risk-relevant inflection point is when casual exposure becomes repeated participation. As a person returns to the same channels, they begin to internalize the group's basic assumptions about what is true, which institutions are legitimate, and who is to blame for perceived harms. Over time, that community can become a primary reference point for identity and meaning, especially if it rewards attention with belonging and treats outsiders as ignorant or corrupt.[3]

CTEC's review of online political violence literature is valuable because it highlights the mechanisms that make these entry points significant. The internet can speed up radicalization by connecting individuals to supportive online audiences and by making grievance narratives and information easy to access. Influence actors often exploit this by requesting small, repeatable acts that foster affiliation—such as sharing a post, joining a private group, "helping" with outreach, or donating to a cause. These micro-commitments matter because they serve as identity rehearsal: the individual practices the language of the movement, learns which claims gain approval, and experiences incremental social rewards for alignment. The pathway can feel like gradual "self-discovery" even as the individual's informational diet and social ties become more limited.[4]

A common pattern is migration from mainstream platforms into more insular spaces. This is often framed as a way to escape censorship or to find "the real truth." In practice, this increases exposure density, reduces corrective feedback, and raises social pressure to conform. Early warning indicators are frequently social rather than operational: withdrawal into a single online milieu, heavier reliance on in-group sources to interpret events, and an increasing need to demonstrate loyalty to the community. Those shifts can precede any concrete planning, but they still reflect movement along a pathway in which later escalation becomes easier. In my analysis of Michail's activities, I see this dynamic as especially relevant.

## II. Escalation Mechanics: Identity, Grievance, and Moral Permission Online

As online involvement deepens, escalation often becomes less about acquiring new information and more about adopting a moral frame. CTEC research emphasizes how online ecosystems can convert diffuse frustration into a coherent identity narrative: an in-group portrayed as virtuous and threatened and an out-group portrayed as corrupt, illegitimate, or dangerous. This identity consolidation matters because it shapes which actions feel permissible. When a community

---

[3] Paula Granger, "Crowdsourced Political Violence: A Literature Review on How the Internet Embodies Leaderless Resistance and Empowers Lone Actors" (Center on Terrorism, Extremism, and Counterterrorism (CTEC), Middlebury Institute of International Studies at Monterey, 2023), https://www.middlebury.edu/institute/media/28584 (PDF).

[4] *Id.*

repeatedly frames conflict as existential and opponents as traitors or subhuman, rhetorical escalation becomes easier—and the psychological distance to violence can shrink for the subset of people who are vulnerable to significance-seeking, grievance fixation, or social pressure.[5] Crucially, "moral permission" is rarely delivered as a single incitement line. It is cultivated through repetition, reinforcement, and social reward. Users gain status for sharper language, more absolutist "us-versus-them" claims, or more aggressive enemy portrayals; doubt is treated as weakness; and moderation is reframed as persecution. Recommendation systems and selective information environments can intensify these patterns by creating an illusion of consensus and insulating the group from correction. Over time, the community shifts from persuasion to enforcement: it trains members to regard escalation as proof of authenticity and restraint as betrayal. Again, I see this dynamic as especially relevant to Michail's case – in his online worlds he created clear enemies and us versus them worlds. Online platforms, especially those with few to no guardrails like Telegram, exacerbated Michail's situation – harnessing his growing hatred of the other.

CTEC's analysis of the online fundraising platform GiveSendGo after January 6 illustrates how narratives can perform this moral work in public. Fundraising texts often reframe defendants through familiar identities—parent, spouse, patriot, believer—while converting legal consequences into moral injury and persecution. Even when the immediate goal is donations, the narrative effect is broader: it sustains a grievance story, binds supporters to a shared worldview, and normalizes interpretations that can justify escalation in future moments of perceived crisis. In this way, rhetoric does not merely express grievance; it can actively erode moral constraints that would otherwise inhibit action.[6] Michail's efforts to recruit members to the Maniac Murder Cult followed a similar pathway, albeit with less of a focus on fundraising and more of a focus on normalizing the conduct of violence based on the perception of a crisis – namely that the governments of the world are abetting the enemy (typically, people of color and Jews).

### III. Leaderless Resistance, Crowd-Enabled Lone Actors, and Logistics

A central theme in CTEC's research on political violence online is that contemporary threats have undergone a structural shift. Rather than operating through tightly controlled hierarchies, many movements function through decentralized networks and subcultures. Individuals may act without direct instruction yet remain psychologically and socially embedded in online audiences that provide validation, encouragement, and an imagined stage. In this model, the ecosystem coordinates without commanding: shared narratives, shared targets of hostility, and shared repertoires of action circulate widely, enabling autonomous mobilization while blurring the boundary between "lone actor" and "networked actor."[7]

---

[5] *Id.*.

[6] Phoebe Jones and Amy Cooter, "White Christian Nationalism after the January 6th Insurrection: GiveSendGo's Online Pulpit" (Occasional Paper, CTEC, Middlebury Institute of International Studies at Monterey, July 2024), https://www.middlebury.edu/institute/media/27423 (PDF).

[7] Granger, *supra* note 3.

This crowd-enabled dynamic helps explain why perpetrators can be operationally solitary while psychologically collective. Online audiences can provide the promise of recognition, attention, notoriety, and belonging, which makes action feel meaningful. Communities can celebrate prior attackers, mythologize violence after the fact, and treat escalation as proof of authenticity. That reinforcement can reduce psychological barriers to action, particularly for individuals seeking status, significance, or a sense of purpose. It can also create imitation incentives, in which would-be actors believe that violence will earn admiration and convert personal grievance into perceived movement service.

CTEC also stresses the enabling role of online logistics. Historically, training and tradecraft were delivered through organizations and in person. In digital environments, fragments of operational guidance—sometimes embedded in forum discussions, videos, or "lessons learned" content— can be assembled by motivated users. The internet does not eliminate practical constraints, but it can reduce the time and effort required to move from fascination to planning. The online world was key to Michail's radicalization. It allowed him to access extremist ideas as well as spread his own, such as through his manifesto, the "Hater's Handbook," which is discussed below.

## IV. When Rhetoric Becomes Violence: Capability, Permission, Push

Across CTEC's research, a practical way to conceptualize the rhetoric-to-violence transition is through three interacting conditions: capability, permission, and push. Capability refers to access to enabling knowledge and tools—tactical guidance, target cues, or practical methods. Permission refers to moral and social authorization: the community signals that escalation is acceptable, necessary, or heroic. Push refers to a catalytic trigger that transforms long-running grievance into an urgent "now," such as a political event, perceived betrayal, legal jeopardy, or acute personal crisis. Risk rises when all three align inside a supportive online ecosystem.[8]

CTEC's work on crowdsourced political violence illustrates how capability and permission can converge. Online spaces supply advice and logistical information while encouraging lone actors to transform grievance into performance for an imagined community. As discussed below, in Michail's case, all three (capability, permission, and push) coincided, easing the path to inciting violence.

## V. Algorithmic-Driven Violence: Why Recommendation Systems Matter

"Algorithmic-driven violence" refers to conditions in which automated curation systems contribute to real-world harm by shaping what people see on social media, in what sequence, and with what intensity. Social media platforms do not present content chronologically; rather, they rank and recommend content using machine learning models tuned to engagement. This matters because escalation often follows predictable steps: repeated exposure; social reinforcement; normalization of extreme frames; and, among a smaller subset, movement from rhetoric to planning. In this framework, algorithms do not "cause" violence in a simple linear way. Rather,

---

8 *Id.*

they can function as accelerants: they reduce search costs, increase exposure density, and create a perception that extreme views are more common or socially rewarded than they are.[9]

Three mechanisms are especially relevant. First, recommendation systems can preferentially surface high-arousal content because it tends to retain attention, thereby inadvertently amplifying hateful or violent rhetoric. Second, personalization can create "rabbit holes," where a user's initial signals (for example, curiosity about conflict, identity, or mental health struggles) lead to increasingly narrow and intense content streams. Third, virality and social feedback (likes, comments, re-shares) can turn harmful narratives into status games, rewarding escalation.[10] Concerns about "algorithmic-driven violence" are not limited to explicit extremist propaganda or direct incitement. They encompass a broader set of pathways through which automated ranking, recommendation, and personalization systems can increase exposure to inflammatory content, intensify grievance narratives, and create self-reinforcing feedback loops. In practice, the same design logic that optimizes for engagement, such as watch time, clicks, shares, and comments, can privilege content that provokes outrage, fear, or obsession. These effects can manifest as (1) amplification of hate and dehumanization in fragile information environments; (2) facilitation of "leaderless" mobilization by distributing tactics, targets, and legitimizing narratives; and (3) harm to vulnerable users through algorithmic "rabbit holes," including self-harm and suicidality content.

For example, Amnesty International has documented how children and young people expressing interest in mental health topics can be drawn into streams of depressive and suicidal content, framing this as a predictable consequence of engagement-optimized recommendation and addictive design features. Several state attorneys general have filed lawsuits against TikTok, alleging deceptive practices and product designs that encourage compulsive use among minors while downplaying risks.[11] [12] [13]  Similarly, in late March 2026 a jury found that Instagram and YouTube were negligent because they were, by design, created to addict children to their platforms. The juries awarded $6 million in damages to a young woman who became hooked on

---

[9] Oyez, "Gonzalez v. Google LLC" (case page), https://www.oyez.org/cases/2022/21-1333.

[10] Carnegie Endowment for International Peace, Caroline Crystal, "Facebook, Telegram, and the Ongoing Struggle Against Online Hate Speech" (Sept. 7, 2023), https://carnegieendowment.org/research/2023/09/facebook-telegram-and-the-ongoing-struggle-against-online-hate-speech?lang=en.

[11] Amnesty International, "Dragged into the Rabbit Hole" (research briefing on TikTok's 'For You' feed and self-harm/depressive content), 2025, https://www.amnesty.org/en/wp-content/uploads/2025/10/POL4003602025ENGLISH.pdf.

[12] Washington State Office of the Attorney General, "AG Ferguson files lawsuit against TikTok for harming youth mental health" (press release, Oct. 8, 2024), accessed January 14, 2026, https://www.atg.wa.gov/news/news-releases/ag-ferguson-files-lawsuit-against-tiktok-harming-youth-mental-health.

[13] New Jersey Office of the Attorney General, "AG Platkin Sues TikTok for Unlawful Practices That Harm NJ Youth" (press release, Oct. 8, 2024), accessed January 14, 2026, https://www.njoag.gov/ag-platkin-sues-tiktok-for-unlawful-practices-that-harm-nj-youth/.

their services when she was a child.[14] These lawsuits emphasize the risks that algorithmic recommendation features pose, more generally, to young people.

The systems are not solely to blame. There is no one answer for why people become radicalized to incite violence. Several other factors contributed to the situation where Michail became immersed in a dangerous online space. And, no doubt, many people will go to the same dangerous places and not become radicalized. Such individuals may have community, family, friends that prevent the move towards dangerous rabbit holes. They may have analytical skills that prevent an online encounter from morphing into offline harm. Still, we cannot ignore that there are many people, often young men, who heed the siren call of the algorithm. Michail, unfortunately, was one such person.

## VI. Meeting with Michail and Concluding Thoughts

On March 11, 2026, I conducted an extended interview with Michail Chkhikvishvili. The conversation spanned his childhood in Georgia, his descent into extremist online spaces, the creation of the Hater's Handbook, and his reflections on the harm his actions have caused. What emerged was not a portrait of an irredeemable ideologue but of a young man whose vulnerabilities were systematically exploited by an online ecosystem that offered belonging, status, and moral permission for hatred at a time when he had few anchors in the offline world.

Michail described a childhood that began in relative stability. He was raised in a traditional, middle-income Georgian household where Russian was spoken at home because of his great-grandmother's influence. His parents were present and caring. The disruptions came gradually: his father withdrew into heavy drinking around the time Michail was ten, his mother endured workplace abuse at her employer, and the household fractured emotionally even as it remained intact physically. At school, Michail faced aggressive bullying from classmates and teachers alike. He began drinking alcohol at fourteen. These are not excuses for what followed; they are the fractures through which extremist recruitment found entry.

Michail's pathway into extremism illustrates with remarkable clarity the dynamics this paper has outlined. At fifteen, he encountered memes about the Christchurch mosque shooting on a Georgian Facebook page. That initial exposure led to a link on Facebook to an archived video of the attack hosted on Mega. From there, Google searches for the shooter's name surfaced Encyclopedia Dramatica and recommended related figures such as Anders Breivik. The algorithmic trail continued: links on 4chan and 8chan pointed to Telegram, where Telegram channels aggregated links to still more extremist channels. At no point in this migration from mainstream to fringe did a platform intervene meaningfully. Google's recommendation engine, Facebook's distribution of the archived attack video, and Telegram's laissez-faire architecture each played a role in lowering the friction between curiosity and immersion. The capability-permission-push framework described in Section IV maps directly onto Michail's experience: the platforms provided capability (access to manuals, manifestos, and operational guidance), his online communities provided permission (celebrating violence, normalizing dehumanization,

---

[14] The Washington Post, "Verdicts against Meta, YouTube reshape legal protections for Big Tech," Ian Duncan. March 25, 2026. Accessed on March 30, 2026 at: https://www.washingtonpost.com/technology/2026/03/25/meta-youtube-verdict-social-media-addiction/

rewarding escalation), and personal crises provided the push (bullying, alienation, a dysfunctional home life, and manipulation by older extremists).

What the interview underscored with particular force is the role of older, more experienced extremists in shaping Michail's trajectory. He met a neo-Nazi girlfriend on Telegram when he was seventeen; she was twenty-two or twenty-three at the time. She introduced him to concepts of dark psychology, edited portions of the Hater's Handbook, and later doxxed him to American Futurists. (Doxxing, or "doxing," is the act of publicly revealing someone's private or identifying information online without their consent, typically with malicious intent.) An administrator of the Right Wing Book Club solicited him to carry out violent acts and distributed manuals on arson and infrastructure sabotage. A leader of the Satanic Front sent him money and encouraged him to practice ritualized self-harm. Igor Krasnov, the founder of the Maniac Murder Cult, operated from a Ukrainian prison with a smuggled cellphone and directed Michail to spread propaganda and recruit. These were not peers. They were adults who recognized his vulnerability and exploited him for the movement's purposes.

The Hater's Handbook itself deserves nuanced treatment. Michail described the first two editions as acts of bragging, written primarily to impress his girlfriend and gain status within his online community. The third edition, which is the most dangerous, was a collective product involving Krasnov, members of NSO9A (a splinter from Atomwaffen Division), and affiliates of the Maniac Murder Cult. AI tools such as ChatGPT and Claude were used for minor tasks (grammar corrections, word changes, artwork generation) rather than for substantive content creation. The ideas originated from human actors steeped in the accelerationist milieu.

As for the link to the Antioch school shooting, Michail's handbook was one element within a much broader ecosystem of online incitement. The prosecution's assertion of a direct causal line between the handbook and the shooting oversimplifies the radicalization process that this paper has detailed at length. No single document radicalizes in isolation. The shooter in Antioch was, like Michail, a product of a convergence of factors: algorithmic amplification, peer reinforcement, personal grievance, and access to an online world saturated with permission structures for violence. Attributing the Antioch attack principally to the handbook misrepresents how radicalization functions and risks obscuring the systemic failures that enabled both the shooter's and Michail's pathways.

During our conversation, Michail expressed what I assessed to be genuine remorse. He described reading victim impact statements until five in the morning, unable to sleep. He spoke with visible emotion about a victim who lost vision in one eye, whose letter he identified as written from the heart rather than drafted by an attorney. He acknowledged that his propaganda contributed to a collective environment in which violence was normalized, and he stated unambiguously that he wished the handbook had never existed.

He also described the influence of his time in a Moldovan prison while awaiting extradition to the United States. In Moldova, he was held in solitary confinement for approximately 11 months, during which time he read the Bible (initially to debunk Christianity, later as a sincere seeker), Russian literature, Greek philosophy, and works on Roman history. Notably, older inmates of diverse backgrounds sent him food and supportive letters, demonstrating a human solidarity that challenged the misanthropic worldview he had adopted. In my professional experience, including my interview with the former al-Qa'ida operative Sajid Badat, I have observed that genuine

deradicalization is possible and that it frequently begins with exactly the kind of introspection Michail described.

Historian Yuval Noah Harari, in his book *Nexus*, observes that "when we write computer code, we aren't designing a product. We are redesigning politics, society, and culture." That insight applies with full force here. The algorithms that guided a fifteen-year-old Georgian boy from a meme page to Terrorgram were not neutral sorting mechanisms. They were, in effect, recruitment tools for violent extremism, not by design but by consequence. The platforms that hosted, recommended, and distributed the content that radicalized Michail bear a measure of responsibility for what he became. This does not absolve Michail of his actions. He made choices, and those choices caused harm. But the court should recognize that those choices were made by a teenager navigating an online environment engineered to maximize engagement without regard for the human cost of that engagement.

Insiders in these large tech companies have also acknowledged that harmful content creates engagement. In a secret internal Facebook memo shared publicly by former Facebook employee Frances Haugen, it was noted that, "we have evidence from a variety of sources that hate speech, divisive political speech, and misinformation on Facebook and [its] family of apps are affecting societies around the world."[15] More recently, other whistleblowers associated with Meta, explained to the BBC that they were, "told by senior management to allow more borderline harmful content – which includes misogyny and conspiracy theories – in users' feeds to compete with TikTok."[16] This outrage that social media companies have cultivated from their addicted users, often targeting children, are now finally being understood as a key contributing factor in the rise of online radicalization. The recent March 2026 jury verdict, noted in section V above, underscores the importance of this.

Michail told me he wants to be known as a family man, not as a neo-Nazi. He wants stable employment, a wife, children, and a life anchored in his Georgian Christian community. He expressed no interest in returning to extremist online spaces and identified mainstream social media as, at most, a tool for community connection. His mother, who is battling breast cancer, remains his primary source of support and the person he hopes will be alive to help him reintegrate. These aspirations are modest and, in my assessment, sincere. I respectfully urge the court to consider the full arc of Michail's story: a young man whose alienation was identified and exploited by older actors within a digital ecosystem that governments and corporations alike have failed to regulate adequately.

*Jason Blazakis*        4/24/2026

Jason Blazakis, Professor of the Practice, Executive Director CTEC
April 24, 2026

---

[15] Yuval Harari, "Nexus: A Brief History of Information Networks from the Stone Age to AI." Chapter 8. Random House, 2024.

[16] BBC, "META and TikTok let harmful content rise after evidence outrage drove engagement, say whistleblowers," Marianna Spring and Mike Radford, March 16, 2026. Accessed on March 30, 2026 at: https://www.bbc.com/news/articles/cqj9kgxqjwjo